The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. It's good to have counsel here. This is our first sitting in almost two years, and I don't know if it's an improvement or not with the various mutations going around, but I must say it's nice to have you here from our point of view, and I think you'll appreciate oral argument better this way than on television, so to speak. All right, we'll hear the first case, McIver v. Bridgestone America. Mr. Hayes. Thank you. May it please the Court, my name is Mark Hayes. I represent the plaintiff here, Ms. McIver, in her claim. Ms. McIver was the victim of years-long harassment when her co-workers repeatedly sabotaged her work machine. That sabotage gave rise to two Title VII claims before this Court today. The harassment itself led to a hostile work environment claim, and when Bridgestone tried to basically discipline Ms. McIver out of making those complaints repeatedly, it gave rise to a retaliation claim. On the hostile work environment claim, Bridgestone really only talks about one of those elements, the severity of it, and Bridgestone's analysis is flawed because it only looks at what I might call the facially racial events from the first part of this case. Now, those events are pretty severe, just to sum them up. A co-worker of Ms. McIver's, Mr. Hawley, hung a noose on the machine of an African-American worker in 2006. He bragged about it openly to other people in the section that he and Ms. McIver worked in. There was no discipline for Mr. Wheeler, who took the blame for it, but wasn't disciplined. Then, as if one noose wasn't enough, there was a second noose, this one fashioned around a monkey, which of course is also a racial figure, hung on someone's machine again. And then, if one monkey isn't enough, there was a second monkey, this one without eyes that was hung on the machine. And then, just as kind of a bonus, I guess, there was some graffiti for Trayvon Martin slash President Obama that had exaggerated figures of African-Americans. There was a Confederate flag, the words Justice Served, which I guess celebrated Trayvon Martin's killing that was found in the bathroom. So, those are all just kind of around Ms. McIver, but we also had some egregiously racist behavior being targeted directly at her. Most specifically, when she comes over in 2007, Mr. Hawley stated the following, quote, we were doing fine without black people on this crew. And then, a year later, said, blamed Ms. McIver was, quote, the reason why black people got to come to this crew. And he also directly told Ms. McIver, hey, you know that noose that was hung on the machine? That was me. So, all of that is the egregious stuff. Bridgestone can't get around that, so its only argument is to try to distance itself from it temporarily. And the way it does that is the way this case evolves, what we might call the next phase of the case, the events are not facially racist. And by that, I mean, if you look at them in isolation, you would say, I don't know if this is racist or not. But there's this series of sabotage which begins within the era of all that facially racist material and then continues all the way to the forced transfer. So, the first link in that chain. When you say sabotage, that's a pretty loaded term. Correct me if I'm wrong, I understood that there were two ways that her machine was being affected. One was the settings she had were changed. And number two, there was grease on the sensors at least a couple of times. But there was no destruction of the machine. Basically, she had to go through all the settings again. Do I understand correctly on that? That's right. Those are the two main types. Three times for the dirt and grease, but then repeatedly, repeatedly with the settings being changed. And that was actually quantified in Bridgestone coming up with hard data about these setup delays. And the reason that those were so significant, if they had just destroyed a machine, then it would have stopped. Right? I mean, she would just move to another machine. But in constantly changing the settings each morning, her setup time is always increased. And so, severity is looking at, two big factors for severity are pervasiveness, so it happens just over years. She makes a complaint in 2008 and sees someone running from her machine and that's where she first makes that connection. The sabotage is based in all this stuff and being targeted. Can I ask you a little bit about the 2008 tampering that we're describing? So when I read your complaint, it doesn't refer to anything in 2008. Right? It's, well, it has an allegation back in 2006, but nothing about tampering. All the allegations related to Ms. McIver start in 2016 and later. Right? That's the substance of the allegations in the complaint starting in 2016. And then when I read, you know, your responses to the summary judgment motion, you say that, you know, she only began being harassed following her second EEOC charge. Right? Which is 2014. And you say in the same filing to the court that she hadn't been accused, she hadn't accused any coworkers of tampering with her machines until 2013. Right? So before the district court, the argument in the complaint and the briefing from your client all talked about tampering at least later than 2013 and disavowed, it seems to me, tampering before that time. And the district court seemed to rely on that in its ruling in talking about the divergence. But you come to our court and say, based on what seems like an ambiguous statement, at least to me, from her deposition, and say, no, no, no, no. There was tampering in 2008 as well. Can you make the 2008 claim given the nature of the complaint and the claims that you made to the district court in your summary judgment briefing? I think the 2008 event, and just for reference, I'll direct this court to page 179 of the Joint Appendix, and then there's another relevant page, 179 and 193. Those are kind of the ones read together, which is the 2008, 179 and 193. And if you read them together, you might conclude that there was tampering in 2008, but it's not clear to me. But take that aside. Assuming you had a clear statement somewhere in the record, it's not in your complaint. It was disavowed in your opposition to summary judgment. Right? It didn't happen before 2013 is the claim you make to the court. And the district court relies on that in issuing its ruling. And then you come to us and say, no, no, no. Our theory is a different theory now. It's not that. It's that, oh, no. This goes back to 2008, and that's how we connect these obviously horrific events in the past to the current situation we find ourselves in. I think the ambiguity, Your Honor, is in, you know, she's being accused of not being a good teammate because she's, you know, calling out specific people. And there's some, I think the ambiguity is that in, is whether or not she's calling out specific people or whether she's lodging more general complaints. And maybe it wasn't, you know, artfully put. But I think that even though she's saying the 2008, you know, I don't know if she would say if it was, if we were in front of a jury, if she would say, well, you know, that's not the degree that I would call rises to the level of sabotage. But it doesn't have to be the sabotage itself. It's just the informing act that explains how a reasonable jury would connect those dots. So, but you said in the brief, and part of this is like not whether she could do this, but my concern is the theory of your case has changed on appeal. And we don't typically let that happen, right? You don't get to try the case below on one theory and then come to us and say, oh, actually, in order to explain why the district court's wrong, let us give you a different theory, right? Because you say that your client hadn't accused any coworker of tampering with her machine until 2013, right? And so, to me, that's the claim that you're making and not that she was making those accusations or that there was tampering in 2008. And so, that's the trouble. So, I'm just trying to understand how I can ignore how you presented the case. And obviously, I'm not talking about you personally, but your client. How you presented the case to the district court and then how that's different from how you're presenting the case to us. And so, even if we agree with your presentation, can we ignore what the case was presented to the district court? I mean, we're evaluating the arguments that you made to the district court, not the new ones you're making now, right? So, I would say, just so that I don't have any time to talk about anything else, I would say I think the ambiguity is about whether she's identifying someone specifically and whether that would rise to the level of what she would call sabotage or not, or whether it's just a messing with that then informs later things that happen. But setting that aside, let's say we just set that to the side. What is the context of when she's making the complaints in 2013 and then up through her conversation with Ms. Hauser in 2016 and then when she meets with Mr. Dar in 2017 and Mr. Mohler in 2017? What's, you know, what's the context there? Well, she knows that machines are being messed with without, you know, with abandon, really, of African American workers. And anyone, even without the 2008, let's just take it off the table. What's the allegation, you said African American workers, where's the information in the record that another African American's machine was being messed with? She was the only one for a while, right? So... Sir? Yes. Wasn't she the only African American for a while? She was the only African American for a while. She came over in 2007 and then a second African American comes over. But not, those are within the MTS section. Of course, it's a terribly large company. So some of these instances, like the noose and the monkeys... When did this other African American arrive? I can't tell you the exact date. It was a couple years later that this, and I know it was a male, came into her particular section. So she started... About 2015, you're saying then? That would be a good estimate. And I'm sorry, Your Honor. Not in the record, though? I know it's not in the record specifically. I know it's not in the record. It has to be like 2008, 2009, because that's when you allege the comment that she's the reason we have African Americans in this section, right? Right. I mean, that would be an inference that a jury could certainly draw, that because of that statement, that was contemporaneous with somebody else coming or maybe about to come. So I think that's a good allay. But regardless of the 2008, when you look back at the machine... workers, plural, machines were being tampered with. And I just didn't see that in the record. I'm just curious, what was the suggestion or evidence that you'd point to that there was evidence or allegation put forward by your client that there was another example? I'm not sure exactly why it matters. You just made the claim that there were multiple workers whose machines were being tampered with. I'm just trying to understand where that comes from. I know that of the original noose for Mr. Hawley and the two monkeys, I know that at least one of those was an African American worker, but I'm sorry, I don't have the site for you. No, the question is, you talked about tampering with the machines. One of the big challenges in this case is to link the tampering to the plant conditions in 2006 and 2007. And I think these questions are probing whether there is enough there. And if there is evidence that other African American machines were being tampered with, that's important evidence. But this is the first time I heard it right here in the courtroom. So, Your Honor, maybe I'm using the word tampering broadly. When I say tampering, I'm using that when someone does something to their machine, which I would include hanging the nooses on, hanging the monkeys on. I'm not saying that there is no other evidence to my knowledge of other setting changes for depositing grease and dirt. You mean that any other employee was subject to them? But of course, is that what you're saying? I'm saying I'm not aware of any record evidence that any other settings or that sort of thing were ever changed. For any other employee? Right, except for Ms. McGovern. Okay. Now, if she is the only one, the only African American. Yes, ma'am. And she is the only one that is subject to the settings changes, that has just as much, it seems to me, force as saying that another African American person. Right. I didn't read in the record that there was another African American person. The comment about this is why we are going to have African American folks seemed to me to be forward looking. I believe it was forward looking, but I know that at some point another African American came into the MTS section. So, she comes in in 2007. At some point, another one comes in. It's referred to obliquely. I don't know when that happens. So, my time is rolling down. Well, I think the question that Judge Niemeyer posed to you about the connection between the playing with the machines and the racist, clearly terrible racist things in the beginning. Anything you have to tell us about that would be helpful. Sure. So, Bridgestone claims that it had no knowledge of the racial character of this sabotage, this what I would call a connected tissue between the extremely racist beginning and then the forced transfer. When Ms. MacGyver goes in and meets with Mr. Moeller in 2017, he asks her, where did this all start? And what does she refer to? She refers to Mr. Hawley hanging that noose. She identifies him as the source of it and the racial component of it as the source of it. So, they were on notice of it. But even if they weren't, even if we just set that to the side, they cannot enter into a see no evil, hear no evil kind of approach to things. And that is really highlighted by the conversation with plant manager Dar. She goes and she goes up the ladder. She goes to Ms. Hauser, she goes to Mr. Moeller, she goes to plant manager Dar, and she brings her complaint in. Mr. Dar says, you need to apologize to the boys. She says, who are the boys? And he just repeats himself. You need to apologize to the boys. Well, what do I need to apologize for? At least tell me. You just need to apologize. When he makes comments like that that are showing such a cognizance of I don't want to put anything on the record, I don't want to say anything, they are deliberately trying to create a record of, you know, nothing is going on here. Not even a denial. But that's just them, and I see them over time, that's just them pleading deliberate ignorance. All right. You have some rebuttal, Mr. Hayes. Let's hear from Mr. Sorokonian. Thank you very much, Your Honor. May it please the Court and counsel, my name is Nicholas Sorokonian. I'm with Holland and Knight, and I'm pleased to be here, especially in person, on behalf of the Bridgestone Appellees. I'd like to start first by answering a question that Your Honor, Judge Richardson asked to my colleague about, and I believe Judge Motz also asked about, whether another African-American employee joined the relevant section within the plant, which is the MTS section. If you look at the joint appendix, the record shows on page 185 to 186, which is Ms. McIver's deposition testimony. She testifies that another African-American, a gentleman named Brian Exum, came after she did to the MTS department. The record is devoid of any mention of Mr. Exum facing or alleging or claiming anything similar to Ms. McIver's claims of tampering or messing with or sabotage, which I agree is a loaded term. So I want to start off with that answer. So I'm looking at 185. Yes, Your Honor. And I'm looking for Brian, oh, I see. I think a year later, if I'm not mistaken, that's when Brian Exum came. Yes, Your Honor. And Chris Hawley said this is the reason why black people got to come to the crew. And so it's your representation that he stayed there too? I do not know that, so I can't represent that, but I believe that's the case. There's nothing in the record that suggests one way or the other. I thought you represented the company. You just might have talked to the client. Well, I do, Your Honor, but I don't want to speak about anything that's not in the record strictly there. My experience is when lawyers don't want to talk about what things are not in the record, those things that are not in the record do not help them. But go ahead. Well, I assure you that's not my intent. So I do want to speak about the questions that we had regarding the tampering and also the timeline, which I think the timeline is particularly important in this case. Judge Richardson, you make good points about what's in the complaint. If you look at what's in the live complaint at the time the district court was ruling on a summary judgment, there was no mention of Mr. Hawley saying anything of these statements in 2007 or 2009. We were doing fine comment or she's the reason other black people came to the section. That's not in there. Does that matter? I mean, I understand, atmospherically, your point, right, that that might cause us to question her later claim in the deposition that attempts to tie her allegations to the terrible conduct that existed before. But, I mean, she did say it in the deposition, right? And, you know, maybe that's not credible, but we don't get to make that judgment at a summary judgment level. It's not in the complaint. It hasn't been alleged before. She makes the allegation for the first time in her deposition. But does that matter? I think it does for at least two reasons, Judge. First, the brief, I think it's fair to say, centers on that character, Chris Hawley. The brief is centered on his conduct because, as opposing counsel pointed out, there's roughly two categories of conduct that's being discussed in the brief. The first one are the things that are, you know, that Ms. McIvor admits were not directed at her, right? The things that either she didn't perceive or see or heard secondhand, we have that category. And then we have just the two references to something Mr. Hawley said, who, by the way, we pointed out in our brief, and she says in her deposition that she's friends with Mr. Hawley. She used to be friends with him. He changed. That's what she says. She says he does. She did say he changed, but she said that she based that off of something someone else had told her, that he wasn't the same as when they had worked together in the other department. But it's never gainsayed in the reply brief. It's something that's not mentioned, but I think that is something to consider, and I think the district court was entitled to consider the timing of the report of what Mr. Hawley, whether friend or otherwise, told her. As counsel pointed out, it was not until 2017 that the statements allegedly made by Mr. Hawley, the statement about the noose, the admission of hanging the noose that was hung in 2006, the 2007 we were doing fine comment, which Ms. McIver says was made soon after she joined that department, the MTS department, and the 2009 statement that Mr. Hawley allegedly said, which was Ms. McIver is the reason why other black people came to this department. Well, was there any evidence to the contrary? Excuse me? There's her deposition testimony, and you're suggesting that maybe it's not credible. I was asking, for example, did you take Mr. Hawley's deposition? Do we know that this is, as it comes to us, it's undisputed? Well, the point I'm making, Judge, and the answer is I'm not necessarily saying it's not credible. We shouldn't consider it. What I'm saying is that, as counsel admitted in the briefs and here, management, human resources, Mr. Mohler, Andy Mohler, he was not told by Ms. McIver. She did not report those statements from 2006, 2007, and 2009 until 2017, which is important not only because of the large gap of time, the large lapse of time, which in itself is important, but it's also important because it came after she started to complain about her performance review she had received a year prior in 2016. So in 2016, she received a performance review saying teamwork, troubleshooting, needs to improve. She complained about the performance review to management, but it wasn't until 2017, after that year's review, which was based on the 2016 review, that she tells Mr. Mohler, oh, this all started back in 2007 or 2006. It's unclear what the record, the record's not extremely clear. But that's the point I'm making, is that you have the large lapse and, from a causation point, the things she was complaining about, the remarks in her review, had already occurred. Well, but she was – her source of great complaints was messing around with her machine. Absolutely. And she made – and that was before she complained about her review. In fact, that led to the review because the employer says that these aren't valid or she takes too long or something, and she says that she has to get the machine working. So that all happened before. And in her mind, I guess, if we take this as the best light for her right now, she has these racist things happening, then she has the machine being messed around with, and then she gets a bad performance review. So you say all she's done is complain about the bad performance review, and all she did was bring out these earlier things with respect to it. But she has been complaining in her mind, maybe not – maybe the record doesn't support this, the messing around with the machine is related to the racist remark. Well, I agree with – And we knew she did. You don't dispute that she complained about the machine before the bad performance review. No, not at all. That's the part – that's the part of the question. I absolutely, absolutely agree with is the point I'm making, and I'll leave it where – I'll leave it right here, but the point I was making was that going to the complaint, the central figure of the brief, Holly, is mentioned in one paragraph about the news, but the statements that were directed at Ms. McIver, the 2007 and 2009 doing fine remark, here's why other black people could come to the department, not in the complaint, and interesting. It doesn't have to be in the complaint. I mean, in the civil context, we have rules that characterize the various stages of the proceeding, and the complaint is intended to put the defense on notice, and pleading evidence is not required. It seems to me what is important in this case is what was the record before the district court in granting summary judgment, and I don't think we're allowed to go beyond the record or have the record supplemented. The right approach might be to figure out to have this thing remanded for some reason to have a larger record made, but I think at this point, we're faced with a record that was made before the district court on summary judgment, and we have to determine whether there was a dispute about a material fact such that a jury could find, and I think we all know that standard, but I'm just trying to deemphasize the reliance on the complaint and focus more on the record before the district court. I absolutely agree, and I'm sorry I was trying to just be thoroughly round out the point. I understand what you're, I just didn't want us to get bogged down in the complaint because they could have said a lot less of the complaint and still had a complaint. Absolutely, and this is not an appeal from a motion to dismiss, so I absolutely agree. But to Judge Motz's question, yes, she did complain about the tampering. We'll just say tampering, and that should include whatever species of that were discussed. She first complained about it according to the record, according to her deposition, in 2008, and then there was a 2013 complaint that she made via the bridge line, which is Bridgestone's EEO policy and hotline to report things that are, you know, considered to be violations of Title VII or otherwise, and there's a lot of discussion in the brief about adequacy of the investigation in 2013, which I do want to talk about, which is important, but the point, just to finish answering Judge Motz's question, is we contest that her complaints regarding the tampering or the machine were based on race, which was her burden to prove at the district court, because it had to be a protected activity. It can't be a complaint about, you know, things that are not related to, you know, protected status. It has to be something related to her race in this situation. Because if I read the record, she filed a couple of complaints with the EEOC. We don't have those complaints, of course, in the record. Maybe you've seen them, but you don't usually file with the EEOC unless you make some sort of complaint that would be covered by the statute with the EEOC. Right, which is obviously a logical thing to say. I would suggest that she did make the bridge between the tampering and the matters that the EEOC would be interested in, discrimination. Yeah, I understand the point, and, you know, further to our prior conversation, it's not in the record, the actual complaints, the dismissals by the EEOC. I think there's two of them in the record there. No, we know she filed two complaints. She filed four in total. And we don't even have what happened with the others. We don't have the dismissal order, right? I'm not sure. I know that I counted at least two of them in the joint appendix, is what I'll say. But the point is that when she is speaking to other people at the plant, you know, she is talking about the tampering with the machine. And so when she moved into this department in 2007, the record's clear that she was the first African-American employee there. We now know that Brian Exum joined within a year or two. And the point is that when she was talking about the tampering, and these were investigated, and that's why I want to jump ahead to 2013 and talk about that, it was not clear that it was based on her race. And it wasn't until 2017 that she arguably tied. And I say arguably because if you look at the record citations, which I know the court has and will, there's a lot of record citations that don't quite get to where the brief wants it to get. So, for instance, complaints that were made in 2008, for instance, were not about Holly as it was suggested on page 23 of the opening brief. If you look at the joint appendix at page 179 and 180, you'll see the context there. And going to the 2013 investigation, there's something that is quite interesting in the record that was not brought up in the opening brief, and that was, you know, for all the complaints of Bridgestone's investigation into the tampering in 2013, she went to an employee, David Byerly, and he was investigating the tampering with the machine in 2013. She essentially faults Bridgestone because Mr. Byerly, according to her, only asked three questions, and they were all directed to her, she says. But one thing that's incredibly interesting is that she did not provide any corroborative evidence, even though there was, according to her, another employee, Spencer Manning, who could corroborate that something was going on with the machine. She testified in her deposition that she didn't want to involve Spencer Manning and withheld that information, essentially, from the investigators. So, when we talk about the adequacy of the investigation and the reasonableness of Bridgestone promptly, you know, investigating the allegations of tampering, that's something that should also be considered. And if you look through her deposition, there's other instances of not wanting to involve people or not coming forward with everything she had. So, going back to where we started a little bit, there's these instances of what she says were, you know, racial conduct directed at her, the statements made by, whether current or former friend, Holly, that were not told to Bridgestone for over a decade. There was withholding, I would say, or not providing helpful corroborative information that would aid the investigation of the tampering in 2013. So, it's hard to fault Bridgestone when there's these things being held back. And so, it goes to— Bridgestone did know about those. I'm not contesting that they knew about that because, in fact, as you see from the opening brief and the record citations, Bridgestone did investigate those things. So, for instance, the 2006 noose incidents or these instances of the rubber monkeys and the graffiti, you'll see from her deposition testimony that Bridgestone did investigate it. But the problem is, going to the point I was making, the brief suggests that nothing was done or this gentleman, Jason Wheeler, who supposedly is the one that took the fall for the noose incident, was not disciplined. But if you look at the actual record, it's based on lack of personal knowledge. She wasn't involved. She wasn't present. It was sometimes based on hearsay from another coworker who was not involved. So, the things that— Did the company claim that the incidents didn't happen? We're not contesting on appeal that these other incidents happened. Okay. What the point is is that to go to the hostile work environment claim, to root it back into claim here, is it sufficiently pervasive and serious, especially when you have all of these lapses of time? Right? So, for instance, the noose incidents in 2006 in the MTS department, where she was not working. She was in a different department at the time. It happened before she got there. Now, obviously, all of these things are terrible, right? They're reprehensible. They're not right. But that was one instance where she was not involved. Then you had the two incidents with the— Can you help me? Sure. In 2006, when there's a noose incident, there are no African Americans that are working in MTS. Right? According to Ms. McIver's testimony, that's right, yeah. And so, I mean, the obvious implication is that the noose is race-based, and that totally makes sense. But I'm not just having—it just struck me as sort of odd because, you know, it's in a section where there are no African Americans. What do we have—is there any record that suggests what that was about? The record is not—the record doesn't have a lot about that. And I will also say that, you know, just to clarify, I think there's some times in the deposition of Ms. McIver where it's not very clear of whether this was hung on an African American's machine or whether that was in the MTS department or the Times. So, a lot of this is trying to put the facts together from the record we have here. At least Bridgestone seems to suggest that that actually happened in 2000, not 2006. Obviously, we have to take 2006 for this purpose. But your point is we just have to take that as the record. That may turn out not to be true, but there is evidence that could support that happening in 2006. I think that's right, yes. I think that's right. But the point is that you have these instances. So, if you're looking at the hospital work environment, and obviously from the court's en banc decision in Boyer-Liberato, that can be—you can meet that by showing something that's extremely severe, even if it's isolated, maybe one or two remarks, or pervasive. And so, the problem is that the cases that I've read from the court is when you have, again, back to the two categories, it's directed at or kind of not directed at the person. The cases where the severity alone has sufficed, I would say, tend to be directed at the person. So, for instance, I think it's pronounced Xerxes, EEOC versus Xerxes case. I don't know if that's the right way to pronounce it. But those were directed at the plaintiff or the complainant, Ingram. It was very clear that the religiously-based harassment was happening to him and that there were other things in the environment. But in this case—and, of course, Boyer-Liberato as well— those comments were made directly to the plaintiff. So, here, I understand the approach and the theory of the case from Ms. MacIver. But, ultimately, you have too many gaps, not just in time, but also what's directed at her or not. And to just zoom out and say, focusing just on the things directed at her, the two statements, which I'd say the record suggests either they were friends at one time and it stopped, but the point is that she said she didn't report Mr. Hawley because he was her friend and they had gotten along. So, the two remarks that were directed at her were not reported to management. Obviously, there is an obligation to report these things. Bridgestone does have these policies. It has the bridge line. She did avail herself of the bridge line and the EEOC. I seem out of time, but— Can I ask you a question before you sit down? Yes. I thought you were going to focus, and you sort of mentioned it, on the time difference between the time that elapsed. And do you have your best case in which a discrimination case was thrown out because of this kind of distance in the record? Because I'm not sure on summary judgment that's a basis for us to go your way. It surely would be, you know, in front of a trier of fact. Well, I think I would refer you to the brief where we cite Perkins versus International Paper Company and the other cases where the court has held that a gap of even a few months between, you know, for instance, going to the retaliation claim, between a protected activity and the conduct. But see, on the retaliation claim, there isn't the big gap. I mean, according to her. Well, I would at least point this out. I believe there is a gap because, again, even if you assume that she's right about the timing in 2017 telling Mr. Moeller, well, it all started way back then, that was still in 2017. It wasn't until April 2018 that the transfer was presented. Yeah, but she says it's because—you know, this may not be true, but your people didn't—apparently their affidavits aren't in here and we don't have any evidence to the contrary. She testifies that it was because she had been complaining about the machine and she's complaining about the machines because they are played with because of her race. Because of that, she is made—she's transferred to this other place where she doesn't want to be. And then she right away says that that is a discriminatory action. I understand, Your Honor. So there's no lapse there. Well, I— She says that's the basis for her retaliation claim. Your Honor, I respectfully would say it's not clear what she is saying was a protected activity, when it was done, and which one is close to the one that is the right one to look for retaliation because there's a lot of different instances of her talking about— vaguely, by the way, and the Court does look to that as far as specifics on whether that's enough to support— Let me understand what your position on the record is. The most recent racial comment was in 2009? Yes, to her record. So after 2009, up until 2013 when this sort of started, there's no complaint of race or no racial incident in the record. That could support the causation for the tampering in 2013. Well, I think that's correct, and the reason I say I think is that she did file an EEOC claim in 2014, but I believe your sequence is correct. First off, the last statement that was directed to her— we're on the same page—was in 2009. She complained in 2013 about tampering. We dispute that it was linked to any racial comments made to her, which had not been, by the way, the two comments directed to her, even in 2013, were not reported to Bridgestone. It wasn't until 2017. But I think that helps clarify the timeline, but I'm happy to answer any other questions the panel may have. Thank you. Thank you very much. Mr. Hayes, yes, in rebuttal. Yes, Your Honor. So I think this Court has really circled in on a central question, which is what do we do with this facially neutral sabotage material between the last— I would have a lot better time listening to you if you didn't call it sabotage. Sorry. And it is a tampering. Tampering. But sabotage suggests that the machine is being destroyed and undermined and damaged, and the motive is to disable the machine. I certainly don't mean that. It sounds to me like she has legitimate tampering claims. Somebody is annoying her. Right. And causing her an inability to perform well her job, which was included setting up the machine. Right. All right. And that tampering, I'll use that word, to the extent it is grounded in the—has a racial character to it, that strengthens the severity analysis. It strengthens the causal link. When you return back to your answer, Judge Montz asked you a question, and I don't know if you finished great, but it wasn't clear to me. She asked what evidence do we have that connects the 2006-2007 clearly racist activity to the 2015 and later time frame, which is the predominant tampering allegations. And you pointed to a 2017 meeting and a meeting with Dahr. Is there anything else that you think supports the connection between those two? So, I guess it depends, Your Honor, on when we say connection, are we talking about what was actually factually true or what Ms. MacGyver had kind of as her own investigator presented and proven? And I think those are different things. Bridgestone keeps basically presenting it as if Ms. MacGyver had to be— I don't know if you all remember that case, that TV show, Matlock. I used to love Matlock. But, you know, they're doing their own investigation, and they're figuring things out. Ms. MacGyver is not under the duty of connecting all those dots. She doesn't know a lot of times who has tampered with her machine. But she says, this thing is happening, this thing is happening. And everybody knows, she and everybody, knows that— Right. But assume that, I mean, maybe it's a hypothetical, but assume that her machine is absolutely being tampered with, right? And that's 100% certain. Right. And let's imagine, just from a hypothetical to clean it up a little bit, that we have evidence of that from 2015 forward, right? We also have undisputable evidence that in 2006, 2007, and 2008 there are terrible racist things that happen at the plant, right? What I'm trying to get at is, what is the evidence that those terrible racist things are relevant or helpful to proving that the tampering was racial in nature, as opposed to, like, a personal problem, or just a general dispute, or a competition among workers for a promotion, or all the other possible things that, you know, you could tamper for lots of reasons. Sure. Why are those things relevant to the tampering? Right. So, first, I would say at summary judgment, this court should not be weighing the facts and making the distinction about whether hanging the noose on a machine and changing the settings on a machine are such different things that we can't make that connection. They're both messing with the machine of an African-American. And I did find the citation where the hanging of the noose. I don't quite understand that argument. You're suggesting that don't you, on summary judgment, carry the burden of proving your claim sufficient that it can go to a jury? In other words, if the evidence is lacking, then the district court would have been justified to throw it out. What we're saying is, at summary judgment, the question is, could a reasonable jury make this connection? Well, that's right. That's what you have to have evidence. The question to you, and I'm still listening, but the question to you is what is the evidence that links the historical offensive conduct to the tampering that occurred years later? Right. And two things to that. One, I think a reasonable jury could conclude if you hang a noose. I'm asking for the evidence. If you hang a noose. We know the standard, but I want to know what the evidence is that the record contains, that links it to. Just that if you hang a noose and you hang monkeys on African-American workers' machines, as they do, and found that reference that it was an African-American machine, that's JA215, a reasonable jury can then say when the only African-Americans intersections. I thought you said that she was the first African-American there. Right, but that's in a different section. So the noose and the monkeys are not in her section. Is there any evidence that that's within a decade of the 2015? I mean, it could have happened in, based on the record, could have happened in 1967. No. She says 2006. It happened in 2006. And that's in 2015? No, no. I understand the noose. I'm talking about the monkeys. The monkeys we know happened after the noose, but we don't know exactly when. And I can find that at 215? That's where it says it happens after the noose? No, 215 is about the noose, the original noose. The monkeys… The monkeys… It's okay. But we don't know, all we know is that it's after, her allegation is that it's after 2006, but we don't know when after 2006. Right, that's right. The caricatures were between after 2012 or 2013. J, 243 or 44, right? That sounds right. My only closing point is that, and I see I'm over time, is to really dig into the see no evil, hear no evil. They are going out of their way to avoid evidence. And, you know, if there is anything less you can do in an investigation than to ask the alleged perpetrator, did you do it? Then there's not much less than that, because they're just going to say no. And that's all they do. What's their investigation? That would be the question I would pose to them if I could ask them one more question is, why didn't you do anything? Why didn't you just go down and look at the machine? You had the opportunity to depose them, didn't you? We did, but it's not our burden to… It isn't. …and to demonstrate in the record why you're entitled to go forward with your claim. That's right. Well, Ms. McIver presented evidence of the tampering, and there's data to back that up. She doesn't have to disprove their best argument to the counter. No, but going back to Judge Niemeyer's question that led off the rebuttal, it was that you, what evidence do you have in the record that links the terrible racist things in the beginning and the tampering with the machines, and in suggestion that the tampering is also racial-based? Right. And it seems to me the best evidence you have is your client's testimony. She thought that. Right. Now, she may be disproved, but that's what's in the record. Right. And I think that the thing she experienced at that time, which was sabotage when she saw the person running, tampering of some kind, she saw the person running from a machine, that's repeated. If someone uses the N-word and then the next day throws a wet paper towel at the back of your head, like they do in the Xerces case, you know that wet paper towel has racial charge to it. If another wet paper towel comes a week later, a month later, a year later, same racial charge. You don't have to be accompanied by monkeys and nooses every time. I see my time's up. All right. Thank you, Mr. Hayes. Do you want to go down? Okay. Yeah, okay. I was trying to consult. We have a tradition, as you guys probably know, to come down and greet counsel. It's a grand tradition we've carried on since the 1930s, and we're not abandoning that tradition, but we have suspended it during the COVID era, and so I think we'll continue in the wisdom of that. The next time you come, I'm quite sure we'll come down and shake your hands, but in any event, we thank you for your arguments, and this little comment by me on behalf of the Court should suffice until the next time. Thank you very much. Thank you very much, Your Honor. Thank you. We'll proceed on to the next case.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Julius N. Richardson